## Case No. 12,402.

### SAWYER et al. v. OAKMAN et al.

[7 Blatchf. 290; 5 Am. Law Rev. 381.] [1]

Circuit Court, S. D. New York. June 11, 1870. [2]

WHARVES—INEQUALITIES IN BOTTOM — INJURY TO VESSEL—SUNDAY WORK—FEES PAID FOR SURVEY—DEPRECIATION IN VALUE.

1. Circumstances stated under which the owner of a wharf is bound to notify the master of a vessel which is about to haul in to such wharf, as to the condition of the bottom alongside of the wharf, where the vessel, when hauled in, will touch the bottom by the fall of the tide.

[Cited in Nelson v. Phoenix Chemical Works, Case No. 10,113; The Niantic, 6 Fed. 635; Pennsylvania R. Co. v. Atha, 22 Fed. 924.]

2. The owner of a wharf, making use of it for gain, in the course of his business, is liable for the damages caused by inequalities in the bottom alongside of the wharf, to a vessel lawfully using the berth in the course of business and exercising due care.

[Cited in Pennsylvania R. Co. v. Atha, 22 Fed. 924.]

3. Although the act of hauling a vessel into a berth at a wharf on Sunday is an illegal act under a state statute, yet if damage be suffered by the vessel on that day, at such berth, through the wrongful act or omission of another, the owner of the vessel may recover against him for such damage, in admiralty, in a court of the United States.

[Cited in Ball v. Trenholm, 45 Fed. 588.]

4. Cases stated in which fees paid for surveys of injured vessels are allowed as part of a recovery.

[Cited in New Haven Steam-Boat Co. v. Mayor, etc., 36 Fed. 716; The Alaska, 44 Fed. 500.]

5. The rule stated, in respect to allowing a libellant for depreciation in the value of a vessel injured and repaired.

6. The expense of a protest disallowed, in this case.

[This was an appeal by Samuel Oakman and others from a decree of the district court for the district of Massachusetts (Case No. 12,404), in a libel by Charles Sawyer and others against Samuel Oakman and others, to recover damages sustained by libellants' boat. The cause was removed into this court from the circuit court for the district aforesaid, pursuant to Act Feb. 28, 1839, § 8 (5 Stat. 322).]

John Lathrop, for libellants.

H. D. Hadlock, for respondents.

WOODRUFF, Circuit Judge. A decree in favor of the libellants having been made in the district court of the United States for the district of Massachusetts, the respondents appealed to the circuit court, claiming that, upon the whole case, they are not liable for the damages awarded to the libellants, and that, if liable at all, the commissioner by whom the amount of such damage was ascertained and

¹ [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission. 5 Am. Law Rep. 381, contains only a partial report.]

² [Affirming Case No. 12,404. Decree of circuit court affirmed by supreme court; unreported.]

reported, erred in allowing certain items which he included therein. The libellants, having, in the district court, taken certain exceptions to the report of the commissioner, by reason of the disallowance of certain items claimed as damages, which exceptions were overruled in the district court, also appealed to the circuit court. It appearing that the Honorable Nathan Clifford, the associate justice of the supreme court of the United States assigned to the first circuit, is so related to one of the parties as to render it, in his opinion, improper for him to sit on the trial of the case on appeal, it was in May, 1868, ordered, that this fact be entered of record, and that a copy of such order, with the proceedings in the said suit, be certified to this court, at a term thereof therein mentioned, to be held at the city of New York, and the same were so certified in pursuance of the act of congress in that behalf. Act Feb. 28, 1839, § 8 (5 Stat. 322). The suit was accordingly brought to trial in this court.

The schooner Bowdoin, of Portland, in the state of Maine, whereof the libellants are owners, on a voyage from Philadelphia to Boston, and having on board a cargo of coal consigned to Messrs. Crane & Fassett, but deliverable at the wharf of the respondents, arrived on or about Monday, the 22d of October, 1866. On reporting her arrival, her master was required by the respondents to await the discharge of two other vessels, and she was accordingly laid at the outer end of the wharf, and there remained until Saturday, the 27th. The dock was of such depth of water that vessels could enter only at high tide; and when, on the afternoon of Saturday, the second of the two vessels thus preferred was hauled out, the Bowdoin made an effort to enter, but, the tide having begun to ebb, the current was such that she did not succeed, and she was requested by the foreman of the wharf, or person superintending the discharge of vessels, to be in the berth thus vacated in such season that the discharge might be commenced early on Monday morning. Shortly before high water in the afternoon of Sunday, she was hauled into the dock by her master and crew.

The wharf of the respondents was about three hundred feet in length, and was wider at the head, or next the shore, than at the outer end. The change in the width on the easterly side thereof was at a distance of one hundred and twenty-five feet from the head, and, at that point, the falling off in width was by a rectangular "jog" about five feet in depth, to which jog the wharf was built of stone, and thence outward it was extended, of the narrower width, by and upon piles. At the head of the dock, and for a considerable distance outward, the bottom was bare at low water, so that vessels lying at or near the inner portion of the wharf took ground as the water receded. At the outer portion of the dock, the water was of sufficient depth to float vessels alongside of the wharf, even at

low water. The Bowdoin was directed to take the inner berth, and did so; but it is claimed by the respondents that she was not hauled in so near to the head of the dock as, under the directions given, she ought to have been. Of course, at low water she grounded and, after she took ground on Sunday night her master retired to his berth, from which he was called on Monday morning with notice that his vessel was in danger. It then appeared, that, through some cause, the vessel had, in the night, become badly strained, that her timbers were broken at or near the main hatch, forward of the mainmast, and at the foot of the mainmast itself, that the floor and ceiling of the cabin were rounded up, that the deck was drawn away from the main hatch, that there were other injuries showing strain and breakage at about that point, and that the stern of the vessel was off and settled, so that, in the language of the witnesses, she was "hogged" and also twisted, so that her masts were not in range. For this injury to the vessel the present suit was brought against the owners of the wharf, who, it appears, are also owners of the wharf upon the other side of the dock.

The libellants aver and claim that the injury was caused by the presence of a considerable body of coal which had fallen into the dock from the wharf at a point directly opposite the place of the principal injury to the vessel, forming an elevation upon which, at that point, the vessel rested when the water receded; that, as she was not supported aft that place, the weight of her cargo caused her to strain and settle away; and that the pile of coal being highest on the side nearest the wharf, she was thrown partially over, especially towards her stern, and twisted.

On the part of the respondents it is alleged and claimed, in their answer, that the dock is constructed with a view to the two berths, so that the upper one is upon a shelf extending from the head of the dock to the jog in the wharf, upon which vessels there discharging will lie safely aground; that, from the jog outward, there is an abrupt descent or slope of the bottom to the deep water of the lower berth, wherein vessels are intended to float at all times; and that the cause of injury was the neglect of those in charge of the Bowdoin to haul her to the place where they were directed to place her, so that, instead thereof, they left her partly in one berth and partly in the other. They have given proof showing that, when hauled in on Sunday, her stern extended outwardly about twenty feet beyond the jog in the wharf.

On the trial, the respondents attempted to show, and, on the argument, their counsel insisted, departing somewhat from the specific statement of the cause of injury set up in the answer, and apparently for the purpose of explaining why the immediate place of the strain, injury and bulging upward was so far forward, that the hogging of the vessel was caused by the manner in which she was laid alongside of the wharf, namely, that she was not laid parallel with the wharf, so as to bring her keel over the keel track, but that her stern was at such distance from the wharf that her keel lay obliquely across the keel track, and so, when she settled, rested on the bank on its easterly side, (formed by the frequent pressure of vessels into the mud, by which pressure a keel track or bed for vessels was formed,) and that this was the elevation near the centre of the vessel which prevented her from settling evenly to and into the bottom of the dock. They deny that the coal in the dock was of such quantity, or in such place, as could have caused the injury. They also insist, that if the Bowdoin had been hauled in and laid parallel with the wharf and farther inward, so that her bow would have been near the head of the dock, no injury would have been sustained. They further insist, in their answer, and on the trial, that the hauling in of the Bowdoin was a violation of the statute law of Massachusetts, providing, that "whoever keeps open his shop, warehouse, or workhouse, or does any manner of labor, business or work (except works of necessity or charity) on the Lord's day, shall be punished by a fine not exceeding ten dollars for every offence;" and that, for this reason, the libellants are not entitled to a decree.

The testimony on both sides is very voluminous and greatly conflicting. I cannot, within any reasonable time, or within any proper limits to an opinion, discuss the details of the evidence, or review the various arguments of the counsel by whom the case was discussed with great ability and minuteness. I have not attempted, in the statement above given, to notice many of the details of claim and defence, but only to state enough to make my conclusions intelligible.

Whether the bottom of the dock is in fact so graded that there was any such abrupt descent of the bottom, at the jog in the wharf, or for a distance below, as made it in any degree unsafe to lay the vessel where she was placed on Sunday—whether it is proper to so grade the bottom of a dock as to form such shelf or terrace—whether, if that be the form of the bottom, it is not the duty of the wharf-owner to inform the master of a vessel coming from a port in another state, of that fact, that he may act with knowledge thereof in placing his vessel—whether the master or mate, in this case, received directions which apprised him that he ought to bring his vessel nearer the head of the dock—whether the position of the vessel in that respect was the real cause of the injury, or, whether, on the other hand, it was caused by the presence of the pile of coal alleged by the libellants to have sustained the vessel at the point of injury—whether she was laid parallel with the dock when brought in, or, on the other hand, was swung off at her stern by reason of the form of the bottom, made uneven by the presence of a sloping pile of coal—whether, when

she was hauled in, proper fenders were used to throw her off from the wharf, and bring her keel over the keel bed—upon these and other questions of fact and of law, and upon the credibility of witnesses, the claims of the parties and the testimony are in irreconcilable conflict.

It appears, by the testimony taken in the court below, that, upon the taking thereof, very numerous objections were made by the parties respectively to the competency of witnesses, to the form of interrogatories, and to the admissibility of testimony. On the trial and argument, however, these objections were not renewed on behalf of the respondents, nor was my attention called thereto. I must, therefore, regard them as waived.

My conclusions, after a careful and laborious, but, I trust, thorough and patient examination of all the testimony, and a comparison thereof in all its parts, are in substantial accordance with those stated in the opinion of Judge Lowell, of the district court, before whom the case was first tried; and I do not find in the testimony of the witnesses who were for the first time examined in this court, any sufficient reason for rejecting the conclusions reached by that court, while, on the other hand, the testimony given on this trial by some of the witnesses examined below for the respondents, is weakened by the evidence of discrepancy between their testimony in that court and this. Nevertheless, it is not upon such discrepancy, that, in any considerable degree, my conclusions of fact are founded.

(1.) In the first place, the proof shows to my satisfaction, and I accordingly find, that the Bowdoin was hauled into the dock, and laid alongside of the wharf, with all due and proper care and in a proper manner, parallel therewith, when taken in on Sunday, and that the swinging off of her stern to the position in which she was found on Monday morning was due to the cause which produced her injury. The testimony of those who took her in is unqualified and mainly uncontradicted on this point. The testimony on behalf of the respondents, as to her situation on Monday morning, is greatly conflicting, and, conceding that her stern was then as far from the dock as may reasonably be inferred from such testimony, that fact is entirely consistent with the testimony on behalf of the libellants, that it was caused by the same circumstances which brought the strain upon the vessel and caused her to lean over towards her side and from the wharf.

(2.) This conclusion is inconsistent with the theory of the respondents, that the injury was caused by the placing of the vessel obliquely over the bank outside of the bed in which she ought to have lain in her berth. And, in my judgment, that theory cannot be sustained for another reason. On Monday morning, the bow of the vessel was very near or against the wharf; and the bank outside of the keel track and bed for vessels was at such distance from the wharf that, to have placed her obliquely over that bank, so that the bank would have been beneath the place where her bottom was lifted, would have thrown her stern nearly thirty-five feet from the wharf—a condition of the vessel not only wholly inconsistent with the testimony of those who hauled her in, but grossly incredible in itself, and in fact not claimed by the respondents on the argument. To the suggestion, that the elevation producing the strain was not necessarily immediately under the place of fracture, it may be answered, that, if the suggestion be conceded, still, to have placed the keel of the vessel upon the bank even at the stern would have placed the stern more than one-half of the vessel's width from the wharf; and, again, if the keel rested on the bank near the stern of the vessel, which it must have done if at all, the tendency would have been not to "hog" the vessel, but to produce a curve in the opposite direction, the centre of the vessel settling instead of rising. Without placing great stress upon these geometrical estimates, I add, that they, in connection with the proofs already referred to, suggest very forcibly to my mind, that this theory of the injury, by resting the vessel obliquely on the bank, is an after-thought, in some degree, at least, originating in the difficulty of accounting for the injury at the place of the strain and fracture, except on the theory of the libellants. No such explanation of the cause of the injury is intimated in the respondents' answer. In the answer, the respondents have distinctly specified the negligence of the vessel upon which they rely, and which, as they aver, caused the misfortune. I am constrained by these considerations to conclude that, on this point, the defence wholly fails.

(3.) Whether the injury was caused by the elevation in the bed of the vessel by the presence of a quantity of coal, greater or less; or, whether it was caused by the position of the vessel, her stern overhanging a shelf in the bed of the dock some twenty or twenty-five feet—is, unquestionably, left in much doubt by the conflict of testimony. It is, however, a noticeable fact, that even the respondents' witnesses are some of them driven to reject the last-named explanation, and resort to the oblique position of the vessel on the bank for a satisfactory explanation.

If I deemed it essential to a correct decision of the case, to state a conclusion upon this point, I should say, that, after a close scrutiny of the evidence, I deem the allegation of the libellants in this respect best sustained. The deliberate judgment of the witnesses called there on Monday for the special purpose of examination into the cause of the accident, and their repeated subsequent examinations, are entitled to great weight. At that time, the respondents, manifestly resting on their theory of the effect of overhanging the shelf, appear to have taken no interest in the examination. The influx of a body of coal into the dock at

the point in question was a circumstance which called for some diligence on their part, either to remove it, or, by thorough examination, see that it could not produce injury. The character of the injury and the place in the vessel where the rounding up and the breaking and crushing of timbers and planks took place, strongly indicate the presence of some elevation in the bed of the vessel at or very near that point. It is not necessary to assume that such elevation was in the very keel track. On the contrary, it is conceded that the vessel, in her proper place, would lie very near the wharf. The coal at the side of the wharf furnished a standing place some two feet out of the water when witnesses were there after the removal of the vessel; and the effect of resting the inner side of the vessel thereon would be to raise it, even though no great quantity of coal was in the keel-track itself, and also have the effect of throwing the vessel over and away from the wharf.

In reaching such a conclusion, I could not, I am aware, succeed in harmonizing the testimony, or refuse the concession that there is very much testimony on behalf of the respondents in hostility thereto, and, probably, none so influential as the fact, that the other vessel, the Daybreak, had just before discharged in that berth in safety, and the testimony that, although the coal has not been removed, other vessels have lain in the same berth and without being injured. Whether that is because they were shorter in length, or because they were hauled nearer to the head of the dock, or whether the often-repeated pressure upon the coal has reduced the elevation, is not very clear; but, that the Bowdoin, in the position in which she actually lay, was injured thereby, seems to me to be the best explanation of the accident.

But, without resting upon that conclusion, I concur with the court below, that the respondents are not exonerated even by the theory that the injury resulted from the circumstance that the stern of the vessel overhung the shelf at the bottom of the dock. If it be deemed established that there was a more rapid descent of the bottom at or near the jog in the wharf, neither the jog nor any information given the master or the mate apprised them of the fact. There is some reason to doubt whether such a mode of grading the bottom of a dock in which vessels are to take ground, is proper; but, if it be justified, there is no doubt that it is the duty of the wharf-owners to give proper notice to vessels coming there from other ports. The advice or the direction given to the master of the Bowdoin was not such as either to inform him of the condition of the bottom, or to suggest to any one who was ignorant thereof, that a difference of a few feet in the location of his vessel was of the slightest moment. The direction given to him, in regard to placing his vessel, had obvious reference to the convenience of the respondents in discharging the coal. It would suggest nothing else. It was given in connection with the movable stage used in discharging; and, having the matter of discharging the coal in his mind, what he did was in substantial compliance with the direction. His vessel was one hundred and fifty feet in length, from the taffrail to the end of her jib-boom; and he hauled in until the end of the jib-boom reached the head of the dock. True, the elevation of the jib-boom was such that it would lie over the wall of the dock when the vessel rested on the bottom; but, having reached a point at which his main hatch was opposite the lower end of the movable stage and at which discharging was convenient, it was not due to any information he had received, that he should haul in farther, projecting his jib-boom over the bulkhead. Still less was it his duty to take up his martingale. He was only bound to ordinary care; and it is abundantly proved, that laying a vessel along a wharf having a similar jog, is neither unusual nor suggestive of carelessness in the master.

I agree fully with the opinion below, that, whether the injury to the vessel was caused by the pressure of the pile of coal or to the shelf in the grading of the dock, it was not the fault of the master. He was using the dock lawfully, in the due course of business; and the respondents, when they directed him to haul in, should have at least taken care that he was informed of these inequalities in the surface of the bottom, if that was material to his safety.

That the respondents are liable for defects in the condition of their dock is not questioned. The cases cited in the opinion below are conclusive on the subject. Philadelphia, W. & B. R. Co. v. Philadelphia, etc., Steamboat Co., 23 How. [64 U. S.] 209; Parnaby v. Lancaster Canal Co., 11 Adol. & E. 223. The opinion of Mr. Justice Gray, in Carleton v. Franconia Iron & Steel Co., 99 Mass. 216, is a very full and conclusive opinion establishing the doctrine, and sustained by most abundant authorities.

(4.) I deem it unnecessary to enlarge upon the question, whether the supposed violation of the laws of Massachusetts, in hauling into the dock on Sunday, is a bar to a recovery for the injury sustained afterwards, when the vessel had grounded. The view taken by Judge Lowell of the decision in 23 How. [64 U. S.], above referred to, is entirely satisfactory to my mind. See, also, the opinion of Judge Shipman, in the case of The Metropolis [Case No. 9,501], in this district; 1 Pars. Shipp. 597, note; and Powhatan Steamboat Co. v. Appomattox R. Co., 24 How. [65 U. S.] 247. In the last case it was held, that placing goods in a warehouse on Sunday did not bar an action to recover therefor, although destroyed by fire on that same day.

(5.) As to the damages allowed to the libellants. The only items excepted to, not disallowed by the court below, are the fees of several skilful and competent men for making surveys of the schooner, who examined her condition from time to time, and made their

reports, stating the condition of the vessel, and what in their judgment was necessary and proper to be done to her, and her condition after the repairs were completed. Such surveys are customary, often quite necessary as a safe guide to the conduct of owners, and often quite important in reference to the relations of owners to insurers, and to regulate the conduct of the master or owner in respect to any attempt to repair, where it is apprehended the cost of repairs will exceed the value of the vessel when repaired, and when the question of abandonment is presented to the owners. Such expenses are constantly allowed as against insurers, and surely a tort-feasor stands in no more favorable position. In a just sense, they are the consequence of the injury to the vessel. I entertain great doubt, however, whether, where it appears that the only object of an examination is to procure evidence of the cause of the injury, to be used against the respondents, the expense can be deemed a proper charge. But the evidence taken by the commissioner is not before me, nor are the facts upon which he found the fees allowable. I cannot say that they were in this case improper.

(6.) As to the libellants' appeal. The sum claimed by the libellants for estimated depreciation I must disallow. It is, as stated in the commissioner's report, "to a very great extent, a matter of conjecture." On very clear proof of actual depreciation and of the extent thereof, where it was shown that, from the peculiar nature of the injury, it was impossible to make the vessel as good as she was before her injury, I have, in one case of collision, made an allowance for depreciation over and above the loss of the use of the vessel and the necessary expenses of repairing, &c. But such allowance should only be made upon proof that is clear, and that furnishes a safe guide in determining the amount. From the nature of the subject, the opinions of witnesses, resting largely on grounds that have no relation to the actual value and condition of the vessel when completely repaired, are wholly unsafe, and can be tested by no appreciable rule of estimate. To act upon them is to expose respondents to great danger of injustice, when substantial justice to the libellants does not require it.

The commissioner reports that the schooner, by the repairs put upon her, was restored so as to be as strong as she was before the accident, and that she was thereby rendered as valuable to her owners for their own use and employment as she was before. If that be so, then she was as valuable to any other persons for their use and employment. But he is of opinion that she would not sell for so much as she would have sold for if the disaster had not occurred. I think it quite probable that market price is, in such a matter, so sensitive, that it might be difficult to satisfy a proposed purchaser that the vessel was as valuable as before, or difficult to satisfy him that he would

in future, should he desire to sell, be able to produce that conviction in the mind of a purchaser from himself. But, the fact being true, that the vessel is just as good as before the accident, the respondents having, by the sum otherwise awarded as damages, made her so, every attempt to estimate the influence of a purchaser's timidity or incredulity on her market value, must be of the most uncertain and vague conjecture, not resting upon any sound reason. It is quite too loose to be the foundation of a charge against the respondents.

As to the item of $15 claimed for expenses of protest, which the commissioner disallowed. No reason for such a protest, in order to charge the respondents, is suggested. No proofs made before the commissioner, showing its necessity or usefulness, are reported to the court. I see no reason for disapproving his report in that respect.

The decree below must be affirmed, and the libellants have judgment for the amount, with interest and costs of the respondents' appeal.

[NOTE. The original respondents appealed to the supreme court, where the decree of this court was affirmed (unreported). On the presentation of the mandate of the supreme court, final judgment and award of execution were entered in the circuit court, ex parte, against the original respondents, and a summary judgment against Lee and Davis, as sureties on the appeal to the circuit court. Under this execution, the body of Lee was taken. Lee thereupon moved to set aside the execution. Upon a hearing in the circuit court, the execution was set aside. Case No. 12,403.]