NEW HAVEN STEAM-BOAT CO. *v.* THE MAYOR, etc.[1]

*(District Court, S. D. New York.   October 3, 1888.)*

1. COLLISION—MEASURE OF DAMAGES—SURVEY AND SUPERINTENDENCE.
   The cost of surveying the injuries done to a vessel by collision, and of superintending the repairs, when necessary to the economical prosecution of the work, is allowable as an item of the collision damages.  A superintendence on behalf of the libelant and a separate superintendence in the interests of the insurer are, however, unnecessary, and the charge for but one will be allowed.

2. SAME—DEMURRAGE—SPARE BOAT—AMENDMENT OF LIBEL.
   A ship-owner is entitled to demurrage for the period during which his boat, injured by collision, is being repaired, though a spare boat, belonging to the same owner, is used as a substitute during the detention.  Amendment of libel to increase claim for demurrage denied, when the facts were known, and the claim as pleaded had been twice before verified on oath, and the amendment was not asked till after trial and apportionment of damages.

3. SAME—WAGES OF CREW.
   The wages of crew, necessarily kept on the injured vessel while she is repairing, are also part of the damage.

In Admiralty.   On exceptions to commissioner's report.
*Wilcox, Adams & Macklin,* for libelant.
*Joseph H. Mosher,* for respondent.

BROWN, J.   1. *Survey and Superintendence.*   In making up the damages by collision, the cost of surveying the injured vessel, and of superintending the repairs, is allowed when the survey and superintendence are reasonably necessary to the economical prosecution of the work.   To that extent such charges are incurred in the interest of all concerned.   If unnecessary, the charge is not allowed.   *The Golden Rule,* 20 Fed. Rep. 198.   From the nature of the injuries to the Continental, it is plain that a preliminary examination and survey were necessary before commencing those repairs, and a proper charge therefor should be allowed.   *Sawyer v. Oakman,* 7 Blatchf. 290, 306; *The City of Chester,* 34 Fed. Rep. 430. This survey, however, did not include specific details of the work to be done.   The repairs were made by day's work.   The libelant had a superintendent who attended to the work daily in its behalf, and its insurers sent other men, who also superintended the work in their interest, and acted in conjunction with the libelant's superintendent.   The libelant paid the charges of the insurer's superintendents.   The respondent objects to that item, on the ground that they acted in the interest of the insurers, and for their satisfaction only, and were not necessary to the work.   It is often to the interest of the ship-owner, in repairing collision damages, to conjoin with it other work, or to do the repairs in some other mode than in the manner most economical, having reference to the collision injury alone; and in many cases it is a matter of skilled judgment, not easy to determine, just how far the work should extend, or in what way it should be done, to make good the injury, and no more.   Constant

[1]Reported by Edward G. Benedict, Esq., of the New York bar.

experience in the adjustment of collision damages shows the practical difficulties that often arise in these ways. The interest of the ship-owner is often opposed to that of his insurer, and of the wrong-doer, who is bound to indemnify both; while the interests of the two latter, in securing an economical repair of the specific injuries, and no more, are identical. An independent superintendence in their interest will often save. many times its cost. No prudent person, knowing that he must pay the damages, would fail to take such a precaution, if in his power. The insurers are in a position to enforce this precaution, and to exact payment for the service by the ship-owner. This service is, as a rule, so beneficial, and often practically so necessary, to economy in repairs, that when paid for by the ship-owner, as in this case, there is no equity in disallowing it. It should be treated as an expense practically necessary to the most economical repair of the vessel, of which the wrong-doer has enjoyed the full benefit in the diminished cost of the repairs. There is no evidence, however, to show that more than one survey or one independent superintendent was necessary. Therefore I allow the full charge for the one, and disallow the charge for the other. *The Venus,* 17 Fed. Rep. 925; *The Olive Baker,* (July 10, 1888,) MS.[1]

2. *Demurrage.* The Continental being disabled by collision from continuing her trips, the Elm City, belonging to the same company, was substituted in her place. The latter was a "sister-boat" to the Continental, of the same size, but much older, slower, and of less value. She was kept by the libelants as a spare boat, for the purpose, in part, as appears from the evidence, of continuing the trips of the line with regularity, in case of accident to one of the regular boats, or during their repair. She was also occasionally let out for excursions, and upon special charters. Demurrage at $250 per day is allowed by the commissioner for 15 days, while the Continental was undergoing repairs. The respondent contends

---

[1] WILLIAMS *et al. v.* THE OLIVE BAKER.

(*District Court, S. D. New York.* July 10, 1888.)

*Owen & Gray,* for libelants.
*Carpenter & Mosher,* for claimants.

BROWN, J. The fact that after the decision holding the libelant's vessel in fault, as well as the claimant's, the damages claimed on the reference before the commissioner are from two to three times the amount stated in the libel, naturally raises suspicion as to the good faith of some of the items presented on the reference. This suspicion is to some extent confirmed by the failure of any specific proof to connect the items with the injury, or to show just how they were necessary, or even used. I am not satisfied, under these circumstances, with mere general statements that they were all necessary. There is, indeed, no such proof of fraud as existed in the case of The Sampson, 4 Blatchf. 28, 30; but more satisfactory proof ought to be furnished to admit items that do not seem necessary. I deduct $71.31 in addition to that disallowed by the commissioner; $5 saved in towage; $15 for survey, since no use was made of it in doing the repairs, (Sawyer v. Oakham, 7 Blatchf. 290, 306;) and allow 13 days' demurrage, at the rate of $30 per day only, which, for a continuous period, without expense to the owner, is in reality a liberal allowance for the "use" of the vessel alone. I greatly doubt that the vessel was worth even that. The services rendered to the schooner after the disaster were more than were necessary for her safety, so far as the evidence shows. If they were an expense reasonably incurred in consequence of the collision, then they should come in with the other damages, and be equally divided. The referee's ruling is sustained on this point. The result is that the amount reported must be reduced $211.65, leaving $1,155.52 due to the libelant, with interest from June 20, 1888, and with one-half the costs. The claimant's exceptions are overruled.

that this claim should have been wholly disallowed, on the ground that the running of the Elm City in the place of the Continental in reality cost the owners nothing, and that they consequently sustained no actual damage in this respect. *The Clarence*, 3 W. Rob. 283, 286; *The Potomac*, 105 U. S. 630, 632. The principles laid down in the cases of *The Cayuga*, 7 Blatchf. 385, 14 Wall. 270, and *The Favorita*, 8 Blatchf. 539, 18 Wall. 603, although these cases differ in some particulars from the present case, are, it seems to me, controlling. The owners were entitled to procure another boat to take the place of the Continental, while she was disabled through the collision. It is immaterial to the respondents whether the substitute was hired from other persons at market rates, or supplied by the libelants themselves. If the latter chose, as a matter of policy, to be at the expense of maintaining a "spare boat" for emergencies, the liability to accidents like the present was one of the causes and inducements to this outlay, as the evidence of the superintendent shows. They are entitled, therefore, to charge for the use of their own boat at the market value of its use, for the time being, precisely as if they had hired her from other owners.

The evidence before the commissioner was principally of estimates as to the value of the Continental, varying from $300 to $500 per day. As the evidence showed that the Elm City fully performed the Continental's work, and that there was no loss in the libelant's business, the market value of the Elm City per day, as the vessel that made good the loss of the use of the Continental, would be more exactly the measure of the libelant's actual and legal damage. *The Cayuga*, 7 Blatchf. 390; *The Rhode Island*, 2 Blatchf. 113, 115. The testimony on the libelant's part, as to the value of the Elm City, makes it $250 per day; the additional $25 spoken of by the witnesses having reference, as I understand, to the extra premium of insurance beyond New Haven, and therefore not affecting this case. The respondent contends, however, that only $200 per day should in any event be allowed. This was the amount stated in the sworn claim presented to the comptroller, in accordance with the state statute, and verified by the libelant's superintendent. It was also the amount stated under oath by the libelant's treasurer, when personally examined before the comptroller in reference to the claim made; and only $200 is claimed in the libel, where, under the verification of the treasurer, that sum is again stated to be "a reasonable charge for demurrage." In the proceedings before the commissioner, after the decision of the cause, notice was given that application would be made to amend the libel by increasing the claim for demurrage to $300 per day. It is suggested that the amount of demurrage specified in the libel, and in the previous claims, was a *pro forma* statement only. I cannot see any reasonable ground for that contention. In the statements made to the comptroller the amount of the claim was the most material part of it. Amendments to the pleadings are, doubtless, to be allowed liberally, when errors have been made inadvertently, as sometimes necessarily happens when the pleadings have been drawn under imperfect knowledge of the facts, and when no special prejudice from

the amendment would arise to the opposite party. In the present case the value of the use of the Elm City in October, 1886, was better known to the libelant's officers than to any other person. They had perfect knowledge of all the facts before the claim was presented. The statements of it at $200 per day, made three times under oath, are the best evidence that this sum was fixed upon with deliberation; and there can be no doubt that, up to the decision of the cause, $200 a day was regarded by the libelants as a fair compensation for their loss by the detention of the Continental. Such statements of the libelants are not only competent legal evidence, as against themselves, but of persuasive force. I do not think it would be desirable in practice, or conducive to the due administration of justice, to permit, under such circumstances, an amendment of the libel claiming increased damages first applied for, after an apportionment of the damages had been ordered; nor does the subsequent testimony, without further explanation than has been given, seem to me likely to furnish so fair a determination of the libelant's actual damage as their original statement of it, three times deliberately made under oath. I must deny the amendment applied for, and allow only the original amount claimed for demurrage, with interest.

3. *Wages of Crew.* I think the proofs sufficiently show payment of $270.33 for wages of the crew of the Continental while she was repairing. A part of the crew left, or were discharged. There is no clear evidence whether the rest who were paid were or were not the same seamen who ran on the Elm City when she took the Continental's place. If they were the same, then this charge cannot be allowed, since no extra wages were paid. It seems scarcely probable that after the Elm City ceased running, before this collision, and while she was kept as a "spare boat," unemployed, she should have had a crew kept idle and under pay. Naturally the Continental's crew, or so many of them as were necessary, would have been transferred to the Elm City. The wages of the Continental's men who could not be transferred, and who were actually and necessarily kept on the Continental, and under pay, during her repair, if there were any such, would be a proper item of damage. The libelant may take further evidence on this point, if desired, in case the facts are not agreed on; otherwise I cannot allow this item, through want of evidence of any such extra expense. The other exceptions are overruled.