## THE LOCH TROOL.

(District Court, N. D. California. January 22, 1907.)

### No. 13,261.

**1. COLLISION—DAMAGES—DELAY.**

Libelant's vessel was injured in a collision on March 10, 1904, and was immediately laid up unrepaired. On August 3, 1904, she obtained a charter: but no contract for her repair was made until October 17, 1904, and she was detained for 24 days thereafter while the repairs were being made. During the same period the owners had two other seaworthy vessels engaged in the same trade, which were laid up, one until August 10, 1904, the other until August 24, 1904. *Held*, that libelant was not entitled to recover damages for loss of the use of the vessel while undergoing repairs.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 290.]

**2. SAME—DEPRECIATION IN VALUE.**

After collision libelant's vessel was actually repaired for $5,295. Such repairs rendered her entirely seaworthy and as staunch and strong as she was before the collision. The repairs were made in accordance with specifications drawn for the purpose of enabling her to be restored to her original classification of "100 A1" in Lloyds' Register, and when completed she received such classification and at once resumed voyages in the same trade in which she was formerly engaged. The repairs did not involve the replacing of each of her frames and beams as were broken by new ones, but the cutting out and splicing of the broken pieces. In order to have taken out the broken frames and replaced them with new ones, it would have been necessary to remove much uninjured material and would have co $25,000 *Held*, that libelant was not entitled to recover an alleged depreciation in market value of the vessel, estimated at from $15,000 to $18,000.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 289.]

See 133 Fed. 804.

Frank & Mansfield, for libelant.

Page, McCutchen & Knight, for claimant.

DE HAVEN, District Judge. The commissioner to whom the matter was referred found that the libelant, owner of the ship Drumcraig, is entitled to recover the sum of $5,725, with interest thereon from December 3, 1904, damages caused by the collision of that vessel with the British ship Loch Trool, and the case is now before the court on exceptions filed by the libelant to the commissioner's report. The grounds of exception are, in effect, first, that the commissioner erred in not allowing damages for the Drumcraig's loss of time while undergoing the repairs made necessary by the collision; second, in not allowing for the cost and expense of restoring her to the same condition in which she was before the collision; and, third, in failing

to allow · damages ·for her depreciation in value, "arising out of and caused by the collision," referred to in the libel.

1. The facts bearing upon the exception first stated are as follows: The · collision occurred on March 10, 1904. Immediately thereafter, the Drumcraig was laid up unrepaired in Oakland creek. · She was; chartered on August 3, 1904, for a voyage from San Francisco to Australia, and the contract for repairing her was not let until October 17, 1904.; and the ·vessel was detained for 24 days while those repairs were being made. There was also evidence tending to show that at the time of the collision. two other vessels engaged in the same trade as that of the Drumcraig, under the same management and in seaworthy condition, were lying in Oakland creek, and there remained unchartered—one until August 10, 1904, and the other until August 24, 1904. One of the owners of the Drumcraig testified in relation to the laying up of these ships as follows:

"Q. There was always business for those ships, was there not, even during this time that they laid up? A. There was always business at the current rates. Q. And those current rates were profitable, were they not? A. I have made them profitable with the ships since I have handled them."

At the time of the collision the Drumcraig had just completed a voyage between ˙San Francisco and Sydney, via Puget Sound, and return, and there was evidence tending to show that the net profits of such a voyage, at the rates of freight which then prevailed would have been about $8,000, and that such voyage could have been performed in eight months. There was also some slight evidence to the effect that the same rates of freight continued for about two months after the collision. But no witness testified directly that the Drumcraig could have received a charter at such rates at any time after the collision˙ and prior to August 3, 1904, or that˛ there was any demand for vessels of her class in that trade or any other. The commissioner, in his report, thus states his reasons for rejecting the libelant's claim for damages on account of the detention of the Drumcraig:

"On the question of demurrage, I believe the rule to be as' stated by the Supreme Court in the case of˙ Williamson v. Barrett, 13 How. 110, 14 L. Ed. 68: 'If there is no demand for the employment, and, of course, ɩ:o hire to ;be obtained, no compensation for the detention during the repairs will. be allowed as no loss would be sustained. But, if it can be shown that the vessel might have been chartered during the period of repairs, it is impossible to deny that the owner has not lost, in consequence of the demurrage, the amount which she might have earned.' I have examined the numerous cases cited in the briefs of counsel. In the case of The Clarence, 3 W. Rob. Adm. 283, there was no proof of any actual loss, and the court says (page 286): 'In order to entitle a party to be indemnified for what is termed in this court "consequential loss," being for the detention of the vessel, two things are absolutely necessary: Actual loss and reasonable proof of the amount. Both must be proved,' etc. Again: 'It does not follow, as a matter of necessity, that anything is due for the˙ detention of a vessel while under repair.' And again: 'The onus of proving her loss rests with the plaintiff, and this onus has not been discharged upon the present occasion.' In the case at bar there is no testimony that the Drumcraig was earning freight, or under a charter party, or that there was any demand for her hiring, or any offer for hire, from the time of the collision on March 10, 1904, until August 3, 1904, on which day she was chartered—a period· of nearly five months. The ship·was detained by reason of the action of the

owners, or managing owner; no attempt being made to charter the ship or offer her for hire. In view of the foregoing, the claim for demurrage is disallowed."

I am satisfied with the conclusion reached by the commissioner upon the question, both as to the facts found by him and the law applicable thereto. That damages for the loss of the use of a vessel while undergoing repairs made necessary by a collision will only be allowed when it is shown that she could have been profitably employed during the period of her detention for such repairs is as well settled as any rule can become by repeated decisions of the courts. The Conqueror, 166 U. S. 110, 125, 17 Sup. Ct. 510, 41 L. Ed. 937; The Potomac, 105 U. S. 630, 26 L. Ed. 1194. And the burden of proof is upon the libelant to show the amount of such damages. Now in this case the libelant might have repaired its ship at once, so that she would have been in condition to accept any employment offered her; but no effort was made to do so until two months after she was chartered and seven months after the collision. The most reasonable conclusion to be drawn from the fact of the long delay in commencing to make the repairs, and the further fact, unexplained, that two vessels under the same management and engaged in the same trade were permitted to lie idle for five months after the collision, is that the Drumcraig would not have received profitable employment if she had been prepared to go to sea at an earlier date than that stipulated for in her charter of August 3, 1904. Indeed, it is a well-known fact that ships of the tonnage of the Drumcraig and engaged in making long voyages are not always able, when coming into port, to obtain a profitable charter without some loss of time; and certainly, if there was any demand for vessels of the class of the Drumcraig, after the collision and before the charter just referred to, the fact was one which might have been easily proven, or, if she was compelled to decline employment during the brief period of time required to make the repairs necessary to restore her to a seaworthy condition, that fact could have been shown without difficulty, and it was incumbent upon the libelant to prove such fact or facts, to entitle it to recover damages for the alleged detention of the vessel.

2. In passing upon the second and third exceptions, it is necessary to consider the following facts: The Drumcraig, after her collision with the Loch Trool, was actually repaired for the sum of $5,295, and this expense was allowed by the commissioner as damages. The evidence shows, without substantial conflict, that the repairs so made rendered the ship seaworthy, and as staunch and strong as she was before the collision. They were made in accordance with specifications drawn for the express purpose of enabling her to be restored to her original classification of "100 A1" in Lloyds' Register, and when completed she received such classification, and at once resumed making voyages in the same trade in which she was formerly engaged. It is true some of the witnesses described the repairs as "temporary," and the vessel as having been "patched"; but the evidence upon the whole leaves no doubt of the fact that these repairs were of a permanent character, such as would be expected to last as long as the life of the vessel, and made her as efficient and seaworthy as before the collision,

and there is no evidence that the owners contemplated, or contemplate, making any further repairs. The only difference between the ship as she was before receiving her injuries and after she was repaired was that, instead of having such of her beams as were broken in the collision replaced by new ones, the injured parts were mended, or, as described by one of the witnesses, "the broken pieces were cut out and butts made in the frames, with bosom pieces over the butts." To have taken out the broken frames and replaced them with new ones, it would have been necessary to remove much uninjured material in order to reach the damaged parts, and would have cost, according to the lowest bid received, $23,990, a sum $18,695 greater than was paid for the repairs actually made; and this method of repairs, although more expensive than the one actually adopted, would not have added to the efficiency of the vessel as a seagoing ship, or have enabled her to secure more or higher rates of freight. But, notwithstanding this, several witnesses testified that the Drumcraig had depreciated in market value from $15,000 to $18.000, because these more expensive repairs were not made; that upon an examination of the vessel it would appear from the repairs made that she had been injured in a collision, and knowledge of this fact would make her that less valuable if offered for sale and the libelant insists that such depreciation in market value is an element of damage for which recovery should be had. I am unable to agree with this contention. The vessel, by the repairs made, was, as has been stated, restored to her full efficiency as an ocean carrier, the purpose for which she was constructed and used; and the libelant is therefore only entitled to recover the reasonable cost of such repairs. Sawyer v. Oakman, 7 Blatchf. 290, Fed. Cas. No. 12,402; Petty v. Merrill, 9 Blatchf. 447, Fed. Cas. No. 11,-050; The Monitor and The Hill, 3 Biss. 24, Fed. Cas. No. 9,711; The Baltimore, 8 Wall. 377, 19 L. Ed. 463. In the case last cited the Supreme Court said:

"'Restitutio in integrum' is the leading maxim in such cases, and, where repairs are practicable, the general rule followed by the admiralty courts in such cases is that the damages assessed against the respondent shall be sufficient to restore the injured vessel to the condition in which she was at the time the collision occurred."

And if the vessel is made precisely as strong, staunch, and serviceable as she was before the collision, she is restored to her former condition within the meaning of this rule. That this is all that is required very clearly appears from the case of The Monitor and The Hill, 3 Biss. 24, Fed. Cas. No. 9,711. The question was there presented whether the libelant was entitled to recover the cost of a new mast to take the place of an old one which had been injured in a collision. While the fact that the injured mast was old and weak was given some weight in the conclusion reached by the court in that case, the following language from its opinion is a correct statement of the rule applicable here:

"The evidence shows that the mast was not broken off, but was cracked or strained to such an extent as to render it unsafe for service in the estimation of all who saw it; and it was properly fixed at the expense of $58 and one day's delay, so that it seems for all practical purposes to have been as useful as

it was before the injury. It may not have been as symmetrical, but it evidently was as serviceable. It is claimed on the part of the libelants that they were entitled to a new mast in place of the old one thus broken by the carelessness of the respondents; and this might possibly be true, if the old mast had been rendered entirely worthless, so that it was impossible to repair it and make it fit for service. But the proof shows that by fishing it it did good service during the entire season, and there is no evidence, but what it would have continued as serviceable for the remainder of the life of the vessel. * * * The rule of compensation, where the damage can be repaired, is to make the injured part as nearly as possible as good as it was before the injury occurred; and, applying that rule to this case, it seems to me the respondents ought not to be mulcted in the cost of the new mast. The old mast, when repaired, served all the purposes that it did before the injury."

In the case of The Helgoland, 79 Fed. 123, an allowance of $1,800 for depreciation in value of the injured vessel was allowed, but this was upon the express ground "that the twist given to the boat remained evident and palpable, notwithstanding all that could be done to correct it," and "that a boat thus sprung and twisted has not the endurance, or the life, of a boat not thus strained and out of shape"; and it was said by Judge Brown, in the course of his opinion:

"The allowance here is not upon the vague notion that she is not as good, or will not sell for as much, simply because she has been in collision, when everything discoverable has been apparently rectified and repaired. Here what remains is palpably not repaired, and could not be, without great expense. This boat was one of the finest of the kind ever built, costing about $21,000 a few months only before the accident. An allowance of between 8 and 9 per cent. for the inferior value and endurance power of the boat is, it seems to me, a fair and moderate allowance, of which the defendant should not complain."

In Sawyer v. Oakman, 7 Blatchf. 290, Fed. Cas. No. 12,402, the precise question arose, as it does here, whether, when a vessel has been repaired so as to be as strong and seaworthy as before the injury, her owner is entitled to recover damages on account of her depreciated market value, and the court in its decision of that question, said:

"The commissioner reports that the schooner, by the repairs put upon her, was restored, so as to be as strong as she was before the accident, and that she was thereby rendered as valuable to her owners for their own use and employment as she was before. If that be so, then she was as valuable to any other persons for their use and employment. But he is of opinion that she would not sell for so much as she would have sold for, if the disaster had not occurred. I think it quite probable that market price is, in such a matter, so sensitive that it might be difficult to satisfy a proposed purchaser that the vessel was as valuable as before, or difficult to satisfy him that he would in future, should he desire to sell, be able to produce that conviction in the mind of a purchaser from himself. But, the fact being true that the vessel is just as good as before the accident, the respondents having, by the sum otherwise awarded as damages, made her so, every attempt to estimate the influence of a purchaser's timidity or incredulity on her market value must be of the most uncertain and vague conjecture, not resting upon any sound reason. It is quite too loose to be the foundation of a charge against the respondents."

This is so clear a statement of the rule which rejects evidence of depreciated market value as an element of damage, when a vessel has been fully repaired and thereby made as serviceable as before a col-

lision, and of the reasons underlying the rule, that further discussion of the question is not deemed necessary.

The exceptions are overruled.