## THE BENJAMIN A. VAN BRUNT.

## THE CANANOVA.

(District Court, E. D. Pennsylvania. January 16, 1925.)

### No. 179.

**1. Collision ⟨⟩133—Measure of damages for loss of vessel is market value, if that can be shown.**

Under the rule that restitutio in integrem is the maxim to be applied in collision cases; if it is shown by evidence that a vessel substantially identical with that lost can be purchased in the open market for a certain price, that price represents market value so far as the loss of the injured party is concerned.

**2. Collision ⟨⟩128—Measure of damages for loss of vessel.**

That the owner and master of a vessel lost in collision was of more than usual ability and skill, and was able to obtain profitable charters and make good earnings, is not an element to be considered in estimating his loss, where the vessel could be replaced in the market.

**3. Collision ⟨⟩133—Where the cost of repairing an injured vessel exceeds her market value, that value is the measure of damages.**

Where the cost of repairing a vessel injured in collision was more than the price at which a vessel to replace her could have been bought in open market, she must be considered a constructive total loss, and the measure of damages recoverable is her market value, with interest from the time of collision, loss of freight on the voyage, and incidental expenses in bringing her into port and ascertaining the extent of the damage.

**4. Collision ⟨⟩128—Loss of vessel; loss of profits of future charter not an element of damages.**

Where a vessel was a total loss as the result of collision, estimated profits from a charter not entered upon are not an element of damages recoverable.

**5. Collision ⟨⟩126—Damages recoverable considered.**

Various items claimed as collision damages and objected to, considered.

In Admiralty. Suit for collision by Frank E. Lawry, as owner and master of the schooner Benjamin A. Van Brunt, and as bailee of her cargo, against the steamship Cananova. On exceptions to commissioner's report. Modified.

For prior opinion, see 297 F. 658.

Lewis, Adler & Laws and Otto Wolff, all of Philadelphia, Pa., for exceptions.

Willard M. Harris, of Philadelphia, Pa., opposed.

THOMPSON, District Judge. The cause was referred to a commissioner for the purpose of ascertaining and computing the damages to be recovered by the libelant from the respondent, resulting from a collision held to have been caused by the sole fault of the steamship Cananova. The primary controversy before the commissioner arose over the contention of the respondent that the damages suffered by the Van Brunt caused a constructive total loss of the vessel by reason of the cost of repairs exceeding the market value of the vessel at the time of the collision in her condition immediately prior thereto. The commissioner found that the value of the schooner immediately before the collision was $20,000, and, inasmuch as the damages did not equal that sum, that the case was one of partial loss.

The respondent took the burden of proving the market value by the testimony of seven witnesses· having experience as marine surveyors and appraisers and who testified they knew the prices schooners had brought at or about the time of the collision. They were nearly unanimous in fixing $6,000 as the market value of a schooner of the tonnage, age, and condition of the Van Brunt.

The libelant's testimony upon the question of value consisted of that of one witness, a member of a firm in the business of ship chandlers and vessel agents for a number of years. He placed a value upon the Van Brunt of from $18,000 to $20,000, based upon the fact that Capt. Lawry, the owner, was a skillful master and that the worth or value of a vessel is judged by what she will make under those circumstances.

The commissioner concluded from the testimony of the respondent's witnesses showing that large numbers of schooners were lying idle because of low freight and excess supply of sailing vessels, and therefore vessels of the type of the Van Brunt could not be sold except for absurdly low prices compared with the cost of construction, that there was no market for schooners at or about the time of the collision from which he could find market value. He found, therefore, that the value must be based upon consideration of her worth to Lawry as owner and master, based on her earning ability under his management at the time and the charters he had in prospect; in short, not what she would bring on the market, but what she was worth to Lawry, the libelant. I can appreciate the difficulty of establishing market value from the testimony offered, but am of the opinion that the commissioner adopted a wrong and illogical theory in arriving at his conclusion.

In The Granite State, 3 Wall. 310, 18 L. Ed. 179, the Supreme Court, having under

consideration the damages to the owner of a barge sunk by collision with a steamer and not a total loss, said:

"There cannot be an established market value for barges, boats, and other articles of that description, as in cases of grain, cotton, or stock. The value of such a boat depends upon the accidents of its form, age, and materials; and as these differ in each individual there could be no established market value. A person may make considerable profits by the use of an old hulk of little value in the market for vessels. His loss cannot be measured by the ratio of her profits, as he might supply himself with another at a much cheaper rate."

In The Baltimore, 8 Wall. 377, 19 L. Ed. 463, following the rule that restitutio in integrem is the leading maxim in collision cases and that the damages which the owner of the injured vessel is entitled to recover are estimated in the same manner as in other suits of like nature for injuries to personal property, the court said:

"Restitution or compensation is the rule in all cases where repairs are practicable, but. if the vessel of the libelants is totally lost, the rule of damage is the market value of the vessel (if the vessel is of a class which has such value) at the time of her destruction."

The market price may not be evidence of value in the case of a vessel of peculiar construction, as, for instance, a pleasure yacht, built and designed especially to suit the taste of her owner and the particular use to which it is desired to be put, or a racing boat, or a vessel so built for the coasting trade as to be navigated in the shallow waters of rivers; and in such cases the price paid and the cost of construction may be part of the evidence necessary to establish the quantum of compensation or restitution to be awarded for her loss. The H. F. Dimock, 77 F. 226, 23 C. C. A. 123. But there is no evidence of any peculiarity in the construction of the Van Brunt.

[1] The purpose of applying the maxim, "Restitutio in integrem," in the administration of maritime law is to put the injured party as nearly as possible in the position in which he stood prior to the commission of the wrong, in the same manner as in other suits of like nature for injuries to personal property. The Baltimore, supra. If it can be shown by evidence, therefore, that an article substantially identical to that destroyed can be purchased in the open market for a certain price, that price represents market value so far as the loss to the injured party is concerned; the test being whether the evidence as to market price is accompanied by proof of such conditions as show that the article can be replaced in the market. While market price is evidence of market value, yet it is not conclusive but, like all other evidence, is merely the means by which the conclusion of market value is reached and they are commonly regarded as legal equivalents. Theiss v. Weiss, 166 Pa. 9, 31 A. 63, 45 Am. St. Rep. 638.

The questions, therefore, are whether the evidence shows that there was such a market in schooners that the libelant could, at the time of the accident, have purchased one to replace the Van Brunt, and whether it establishes a price for which the purchase could be made, i. e., market value; if the libelant could so replace the Van Brunt, his loss of the vessel is measured by what he would have had to pay in such market as there was.

The evidence shows that the market for sailing vessels about the time of the collision in May, 1923, was not active. Demand was not great and prices were low. The intrinsic value of a sailing vessel—that is, what it would cost to build one like her—was not represented by the prices vessels were bringing. Persons of ample means who were able to hold their vessels idle were doing so rather than sacrificing the capital invested at the low prices then obtained. With the freight rates low, the operation of schooners was not considered a profitable business. The compensation to the libelant, basing his need for a vessel upon the fact that he was able to make what he considered a fair profit through the sailing of his vessel, must be based, then, upon what it would cost him in the market such as it was, if the market value rule is to be applied. If he had gone into the market to purchase at that time, the low freight rates and the generally unprofitable business would be to his advantage as a purchaser, while it would be to the disadvantage of the seller. I am not satisfied that the evidence does not show that there was a market in which a vessel substantially similar to the Van Brunt could be bought at that time; but, on the other hand, it convinces me that with a large number of vessels lying idle, there was a market in which he could have supplied himself and that the market value rule must be applied.

[2] It is not logical to consider the libelant's experience or skill as a navigator and master, nor the profits he could have made as adding to the value of the Van Brunt and not adding to the value of a like vessel; for, if he purchased another vessel which was her equal and navigated it himself, that skill and experience and the profit to be made

would be applied to the other vessel as well and was in no sense a loss occasioned by the collision. And the fact that he was then operating under a profitable charter with a cargo for Calais, and that he had another profitable charter to Jacksonville, could not enter into the value of the vessel.

The testimony shows that in March, 1920, when, owing to conditions after the war, shipping profits were still high, Mr. Tweedie had purchased the schooner for $75,000, and on December 7, 1922, sold her to the libelant for $10,843.29; the excess over $10,000 being the cost of repairs that had been placed upon her. Mr. Tweedie testified that this amount did not comprise the whole consideration, but that he had made a special price to Capt. Lawry because of a long period of valuable services to his firm in the past and an agreement between them that Capt. Lawry would render valuable services in the future in giving and obtaining some testimony in relation to a lawsuit in which Mr. Tweedie's firm was interested. Mr. Tweedie fixed her value at $40,000 at the time of the sale. This appreciation of Capt. Lawry's past services and the rather vague arrangement concerning services to be rendered in the future do not satisfy me as constituting evidence from which to find any part of the value of the Van Brunt. A large sum of money, however, had been spent upon the Van Brunt prior to the time of her active use. She was sound, staunch, and seaworthy and in sufficiently good condition at the time of the accident to be rated as A1½. She was, however, an old vessel, having been built in 1901, which, no doubt, would stand against her value in the market, notwithstanding her sound condition.

Her market value cannot fairly be based entirely on the opinions of the experts called by the respondents. There is a striking similarity in their testimony as to value which is quite suggestive of prior agreement among them, and they failed to consider facts which should have been considered by them as bearing on that subject. While it does not appear in the testimony that the large amount expended upon the Van Brunt had put her in the condition of a new vessel and this is extremely improbable, yet that expenditure and her sound condition would doubtless have influenced a purchaser who wanted a vessel in paying more than $6,000 for the vessel.

Taking into consideration the repairs that had been put upon her and her equipment and her condition giving her an A1½ rating, her carrying capacity of 1,800 tons, and

3 F.(2d)—42

comparing her with other vessels sold, a conclusion may be drawn as to what it would have cost the libelant to replace her. The Jacksonville, built in 1906, carrying about 1,000 tons, sold for $7,850. The Anthony D. Nichols, built in 1904, of 680 tons, sold for $15,500. The Ruth Merrill, built in 1904, of approximately 3,000 tons, sold for $15,000. The Percy Pine, built in 1916, 1,259 tons, sold for $5,000. If the standard is fixed by those sales, the Van Brunt, being an older boat but in sound condition and of 1,800 tons carrying capacity, should be valued at not less than $9,000.

[3, 4] The fact from the testimony of Mr. Steelman for the libelant that charters were being constantly obtained for other schooners as well as the Van Brunt, facts which did not affect the value set by the respondent's witnesses, and a comparison of the Van Brunt with other vessels sold, induces the conclusion that the market value of the Van Brunt at the time of the collision was at least $9,000, and that is the value I fix from the evidence. As this amount is less than the cost of repairing the vessel, the case must be regarded as one of constructive total loss, and the damage to the vessel arising out of the collision will therefore be fixed at that amount, to which must be added interest from the time of the collision to the time of the entering of the decree. There must be added also damages for loss of freight, reckoning the gross freight less the charges which would necessarily have been incurred in earning the same and which were saved to the owner by the accident, together with interest from the date of the probable termination of the voyage. The Baltimore, supra; The I. C. White (C. C. A.) 295 F. 593. There may also be added the costs incurred by the libelant in bringing the damaged vessel into port and caring for her while ascertaining the extent of her damage and the cost of repairing the same. The Umbria, 166 U. S. 404, 17 S. Ct. 610, 41 L. Ed. 1053; The Reno, 134 F. 555, 67 C. C. A. 479. The estimated profits of the Jacksonville charter not yet entered upon are not the subject of damages in the case of a total loss and must be rejected. The Umbria, supra. The libelant may also recover as bailee of the cargo for damage to it. The Beaconsfield, 158 U. S. 303, 15 S. Ct. 860, 39 L. Ed. 993.

The commissioner found that the gross freight upon the cargo being carried at the time of the collision was $2,635.50, and, with a deduction of the cost of earning the same $1,417.03, the net freight would have been

$1,218.47. The proctor for the respondent contends that, inasmuch as the charter under which the freight was to be earned was for shipment to Calais, Me., and the schooner was chartered after arriving at Calais to carry a cargo from Jacksonville, Fla., to points on the New England coast, the costs of sailing from Calais to Jacksonville should be deducted from the estimated profit on the Calais charter. As the Cananova is not to be held in damages for loss of probable profits on the Jacksonville charter, the respondent cannot have the damages accruing from the Calais charter reduced by the prospective costs of proceeding to carry out the Jacksonville charter.

[5] The commissioner has found for the libelant damages represented by cash advanced by Capt. Lawry to start the voyage, in addition to the net profit on the Calais charter. These items amounting to $705.25 are not the subject of exception, except as to an item of $37.50 for the crew's wages up to May 7, 1923. This is excepted to upon the ground that these wages accrued before the date on which the collision occurred. That is also true of the other items included in the amount of cash advanced, and no reason has been assigned to differentiate it on that ground from the other items which are conceded to be properly included. The net profits on the Calais charter, together with the items for cash advanced found by the commissioner, will therefore be allowed with interest on the net profits from May 26, 1923, and on the cash advanced from May 7, 1923, to the date of entering the decree.

In computing the damages for the costs incurred by the libelant in bringing the Van Brunt into port and caring for her while ascertaining the extent of damage and costs of repair, the commissioner has included several items which I think are properly excepted to. The item of $25.25 for the surveyor for the American Shipping Bureau for insurance purposes is disallowed, as the respondent is not liable for expenses connected with insurance and but one surveyor's fee is allowable. New Haven Steamboat Co. v. Mayor (D. C.) 36 F. 716. The costs of telegrams and telephones are also disallowed as being items of damage not directly attributable to the accident. As to the item for coal used in pumping to keep the schooner afloat, it is clear that there was delay by the libelant for which it would be unreasonable to hold the respondent liable. While it developed in the testimony that Capt. Lawry had not sufficient funds to either repair the schooner or, in case of abandonment, to purchase another schooner, yet these are considerations which do not add to the respondent's liability. I think the cost of one-half the coal, $30, however, should be allowed.

In computing the damages sustained as bailee of the cargo, the commissioner has included some items which are not properly chargeable as damages resulting from the collision. The additional freight at 25 cents per ton charged by the "Pierce" for transshipping the cargo to Calais on 384 additional tons, shipped by the Atkinson Coal Company to save dead freight, is not chargeable as damages accruing to the owners of the cargo. The items for the expenses of the insurance inspector, $21.26, the agency items for Warren, $25, and Cummings, $25, and the item of expense to the insurance company for telephone and telegrams, $84.40, are disallowed, as not being expenses chargeable to the cargo.

The court will not undertake in this opinion to review each of the extraordinarily numerous exceptions (68) taken by the respondent.

The awards of the commissioner will be modified in accordance with this opinion and a final decree may be prepared by counsel and presented. The exceptions severally will be sustained or dismissed in the decree in accordance, as to each exception, with this opinion.