## Case No. 4,506.

### The EPSILON.

[6 Ben. 378;[1] 17 Int. Rev. Rec. 68.]

District Court, E. D. New York. Feb. 7, 1873.

Goodrich & Wheeler, for Sarah Parsons.
Wilcox & Hobbs, for petitioners.

BENEDICT, District Judge. This is a cause of limitation of liability promoted by

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

the owner of the steamer Epsilon. The material facts stated in the libel are as follows:

On the 27th day of May, 1872, while the steamer Epsilon was engaged in her ordinary and maritime occupation in that arm of the sea known as the East river, within the admiralty and maritime jurisdiction of the United States, her boiler exploded, and she was thereby caused to sink immediately.

This accident, the owner insists, was not caused by any negligence or fault on his part, and was without his privity or knowledge, notwithstanding which certain persons who were then on board said vessel have made claims against him for payment of damages sustained by them by reason of said explosion. Some of these claims arise out of personal injuries sustained by persons on board the vessel. Other claims arise out of the destruction of property belonging to the master and crew; others still arise out of the deaths of persons on board, caused by the said explosion; and there is one claim arising out of the death of a person who, while on pier 20, and in no way connected with said vessel, is said to have been so injured by a part of the said steamer thrown by the explosion, that he died, whereupon one Sarah Parsons, the legal representative of said deceased person, has sued the said owner in the supreme court of the state of New York, and within this district, to recover $5,000 damages, by reason of said death. No freight was at the time pending, and the said steamer was so injured, that, although thereafter raised by her owner, her value as she now lies within this district, is alleged to be less than the sum of money expended by her owner in raising her.

Under these circumstances, the owner of the steamer has presented his cause of limitation of liability to this court, and prays that this court would direct an appraisement of the value of his interest in said vessel and her freight, to the end that he may pay the same into the registry of this court, or secure the same to be so paid when directed, and that a monition may issue against all persons claiming any damages of any kind, by reason of the said explosion, citing them to appear before this court, and make due proof of their respective demands, and that this court would declare the limit of the owner's liability, by reason of said accident, and would, upon the payment of said amount into the registry of the court, declare the said owner exempt from further liability, and that this court would distribute among the parties proved entitled thereto any amount so paid into this court, and restrain all persons, including the said Sarah Parsons, from further prosecuting any suit against the said owner to recover damages arising out of said accident. Upon the filing of this libel, notice of the time of application for the appraisement prayed for was directed to be given by publication; it appearing necessary, to avoid injustice, that the value of

the owner's interest should not be appraised without notice to the creditors. Upon the return day of the notice, Sarah Parsons appeared by her attorney for the purpose of objecting to the jurisdiction of the court, and several questions have been presented which I am asked to pass upon in this stage of the case, to avoid expense, delay and confusion.

And first, my attention has been directed to the fact that the libellants ask relief against an adjudication of demands not maritime in character, and therefore not cognizable by this court. Second, that the libel does not show the pendency of any suit in rem or in personam in the admiralty, to recover any of the demands against which protection is sought in this court. Third, that it does not appear by the libel that this court has, or will ever have, any fund in its custody on which to base its jurisdiction in the premises. And, lastly, that none of the demands against which protection is sought by virtue of the act of March 3d, 1851, are within the scope of that act.

In considering these features of this case, I remark first, as I have had occasion before to say in considering the petition of the owners of the City of Norwich for a limitation of their liability—In re Providence & N. Y. Steamship Co. [Case No. 11,451]—that the jurisdiction of the admiralty over such a cause was maintained by the supreme court in the case of Norwich Co. v. Wright, 13 Wall. [80 U. S.] 104, not because of the maritime character of the demands of the creditors, but by reason of the nature of the relief to the owners of a ship which the act of 1851 affords. If I have correctly estimated the effect of the action of the supreme court in regard to this subject, the character of the demands of the creditors is immaterial. But if the rule were otherwise, it would not prove fatal to this cause, inasmuch as many of the demands set forth in the libel are cognizable in the admiralty, the injuries having been done upon the navigable waters of the United States, and some of the persons injured having been at the time engaged in the service of the vessel. The Plymouth, 3 Wall. [70 U. S.] 20. See, also, in this connection, the cases of The Beta, 20 Law T. (N. S.) 988; The Sylph, 17 Law T. 519; The Guldfaxe—an action in the admiralty, by representatives, to recover damages for the death—19 Law T. (N. S.) 748; Crapo v. Allen [Case No. 3,360]; Cutting v. Seabury [Id. 3,521]; The Admiralty Law of Collision, 158; The Sea Gull [Case No. 12,578]. Others of the demands described in the libel, certainly that one of them arising out of the death of the person who was standing upon the pier, are not cognizable in the admiralty (The Plymouth, 3 Wall. [70 U. S.] 20), but the presence of such demands cannot oust the jurisdiction of the admiralty to entertain this proceeding.

In a cause of this character the adjudication of any one demand involves an adjudication of all other demands made and arising out of the same disaster; and from the necessity of the case, therefore, the whole mass of demands may be brought within the cognizance of the admiralty by the institution there of a cause of limitation of liability promoted by the ship's owner. Neither is it fatal to this cause that no suit in rem or in personam has been brought in this court to enforce any of the demands in question. Nor is it requisite that it should appear on the face of the libel that some amount of money is to be distributed in this cause. Objections similar to these have been considered by me in the case of the owners of the City of Norwich, above referred to, and my views in respect to them will be found there stated.

There is, however, in this case, another question of much importance, and that is, whether the act of 1851 has any effect to limit the liability of the ship owner for personal injuries which have been caused, without privity or knowledge of the owner, in the course of and by reason of the use of his vessel in her natural and lawful employment. This question is by no means free from difficulty, but the opinion I have arrived at is, that the act of 1851 limits the liability of the ship owner as well for injury done to the person as for those done to property. This conclusion appears to be compelled by the language of the third section of the act. In that section the words used are, first, "for property, goods or merchandise;" next, "for any loss, damage or injury," and then "for any act, matter or thing, loss, damage or forfeiture done, occasioned or incurred." These words include all kinds of injuries, for which the ship owner may become liable in the use of his vessel, and cover injuries to the person as fully as they do injury to property. Furthermore, section 6 of the act indicates that the intention was to cover injuries other than those to property. The implication of that section is, that the preceding sections cover not only damages arising from injury to property, but in addition thereto "demands on account of any negligence of the master or crew." The supreme court have been unable to consider the effect of the third section to be limited to the goods on board the owner's ship, and it is to my mind still more difficult to find anything in the section which can be said to restrict its effect to demands arising out of injury to property alone. If, as has been suggested by the supreme court, the intention of the act of 1851 was by statute to establish in this country the rule of the general maritime law in respect to the liability of the owners of ships, it must follow that the act be held to cover demands for injuries to persons as well as to property

I am not unmindful that it may be urged that the rule of liability imposed upon the owners of ships by the maritime law is founded upon public policy, and that, when it is to be applied to modern navigation, the limitation of that liability must be restricted

to injury to property, because otherwise the tendency of the rule would be to deprive the public of such protection against accidents as a fear of an unlimited liability for injuries to persons on board vessels will naturally compel ship owners to afford. But this consideration has force only in regard to a certain class of persons, and fails to furnish ground for a construction which, if it places any, must place all personal injuries beyond the scope of the act. Considerations of a very similar character have furnished the ground for all the opposition which has been made to the rule of limited liability, and they have, in most countries, been overpowered by the strong public interest to encourage the investment of capital in ships. It is, of course, highly important to protect the persons of those who are carried in ships, but, in order that there may be any persons carried, there must be ships to carry them. The act of 1851 does not apply to river or inland navigation, but is confined to a commerce where the amount of property and number of persons transported on each voyage is upon the increase, while the hazard of the navigation does not diminish. In a late collision off Dungeness, some hundreds of persons were destroyed or injured. The investment of capital in such a commerce might well be deterred by a refusal to give the benefit of the act of 1851 in respect to demands for injury to the person. The necessary protection of life against neglect may perhaps be better secured by criminal punishments inflicted on those guilty of the neglect than by increasing the risks of capital invested in navigation.

There is also a reason for the rule of limited liability, founded in justice to the ship owner, which is applicable alike to demands arising out of injuries to persons and to property. It is, that the master and crew of a ship are agents forced upon the ship owner by the necessities of navigation, to whom he is compelled to intrust his ship—an instrument of great power for good and for ill, but whose actions he cannot, in the nature of things, superintend or control; and for whose acts either of omission or commission, therefore, he should not be responsible beyond the value of the property which he has been willing to commit to their control. Boulay-Paty, tome 1, p. 269; Bedarride, Com. du Code de Commerce, liv. 2, traité 1, § 298. We may also look at the law of the two great maritime nations, England and France, as well calculated to throw light upon this question, for "uniformity is almost the essence of the maritime law." Pardessus. Nothing appears in the law of these countries which leads to the conclusion that any such restricted operation should be given to our act of 1851. In England, where—and the fact is characteristic of the nation—it was not until 1734 that any recognition whatever was made in courts of common law of what had been a marked feature of the law of other nations for centuries, the limited liability

acts have been constantly extended, and, although still partial in their operation, they cover demands arising out of injuries to persons as well as to property; which limitation, it may be noted in passing, is there effected in the admiralty, although the demand be that of a representative of a person deceased, under Lord Campbell's act. The English act has restricted operation, because the vessel is assumed by statute to be of a value of £8 per ton, where there is no loss of life, and of a value of £15 per ton where both kinds of injury happen, a feature open to the criticism that while the liability of a wealthy ship owner of a large ship cannot exceed the value of the property he puts at risk, the poor owner of a less valuable vessel may be held liable for an amount far exceeding the value of the property which he has put at risk. See Papers on Maritime Law, by Wendt, p. 130. But our act of 1851 was manifestly intended to have a more enlarged effect than any English statute, and finds its true interpretation in the maritime law of the continent. If we turn then to France, where the rule of maritime law now under consideration has been administered for so long a period, no tendency to restrict the rule can be detected, but the contrary appears. There the Ordinance of 1681 made an election between the more extended liability which existed under the laws of the Romans, a nation which had little commerce, and that more liberal rule adopted by the commercial nations of the Mediterranean, and embodied in the Consulato. The latter was chosen and incorporated in the Ordinance. After the passage of the Ordinance, in opposition to the opinion of Valin, with whom the Roman law had great influence, and in accordance with the opinion of Emerigon (Contr. à la Grosse, c. 14, § 11), the rule was understood to enable the ship owner, by a surrender of his ship and freight, to free himself from all liability of every kind, as well that arising from the contracts as from the faults and torts of the master. The Code de Commerce was long understood as having simply restated, in section 216, the rule as practiced under the Ordinance. And when, in later years the court of cassation evinced a determination to give to that section a restricted effect, and to exclude from it all demands arising on contract, immediate resort was had to the legislative power, and by general request, in 1841, the phraseology of section 216 was so changed as to make the restriction attempted by the court impossible to be maintained.

The text writers on maritime law whose works I have been able to consult, do not appear to allude in terms to the effect of the Ordinance or the Code de Commerce upon demands arising out of personal injuries, but the language everywhere used is broad enough to cover such demands. "The abandonment of the ship and freight puts an end to every kind of responsibility on the

part of the owner." Caumont, Dict. Mar. Law, p. 24, traité "Abandon," § 13. That the rule of the maritime law is there so understood, appears from a case before the court of cassation in January, 1860, involving claims by passengers, where it was declared that "even where the ship is totally lost, and although the passenger has not made a special commercial contract, (acte de commerce), upon taking passage on a steamboat, no provision of law prevents the application of the rule of limited liability declared in section 216 of the Code, otherwise the special responsibility resulting in favor of passengers would be more onerous even than that resulting from a shipment of merchandise. Such an exception would be in fact contrary to the spirit as to the words of the law." Caumont, Dict. Mar. Law, traité "Abandon," § 83. The law upon this subject in Italy, Portugal, Holland, Denmark, Sweden and Russia is said to agree with that of France.

Looking therefore at the words of section third of the act, in the light thus thrown, it appears to me that the full effect can be given to the section which its language imports, and that it should not be considered as confined to demands arising out of injuries to property alone.

But, it is said, this construction cannot be given to the third section of the act, because no terms used in the fourth section can be construed to include demands other than those arising from injuries to property, and the fourth section must therefore be held to engraft a restriction upon the third section. But no such result necessarily arises from the absence in the fourth section of any provision respecting claims for injuries to the person. The manifest object of section 4 was to indicate methods to which resort might be had to carry the third section into effect. It specifies some cases, not necessarily all, where relief may be sought under the act, and it specifies some, but by no means all, the machinery to be used to give the relief. It contains, however, no language which appears to be intended to convey the idea that no other cases than those specified in the section could arise under the act. Even the meagre provisions which the section does contain, seem unnecessary, and in my opinion, the whole section could be stricken from the act, without in the slightest degree impairing its efficiency. Possibly the clause providing for a transfer of the ship to a trustee may be important to the working, as it certainly is to the understanding, of section 3; but even that clause cannot be given effect except under the order of a court, and the language there used is sufficiently broad to enable all classes of demands to receive the benefit of it. The same result could probably be reached by a court of admiralty, without the clause. Results very similar are effected in the course of ordinary admiralty proceedings without any statutory provisions.

The other provisions of section 4 seem clearly superfluous. One of these is a declaration that where there are various demands for damages to property which exceed the amount of the owner's liability, as limited by the third section, they must share the amount proportionately. But section 3 contains by necessary inference the same declaration. When that section made all the demands payable out of a certain amount, it declared in effect, that in case of deficiency the demands must share pro rata. Another provision of section 4 is the declaration, that owners of ships may take appropriate proceedings in court for the purpose of apportioning the sum for which they may be liable among the parties entitled thereto. But it is not said where such proceedings are to be taken, nor when, nor what they shall be; and I take it no special statute was necessary to give to ship owners the general right to take appropriate proceedings in court to obtain relief given them by law. Furthermore, the only proceedings spoken of are those to be taken for the purpose of apportioning the sum for which the owners may be liable; but other proceedings may be taken, for instance, to free the vessel by a stipulation. The remaining provision of the fourth section which confers on freighters and owners of property the right to institute a proceeding apparently intended for the benefit of the ship owner alone, may be the sole foundation for so peculiar a right, and it may well be that the limitation of this provision to demands for injuries to property, excludes holders of demands for injuries to the person from exercising such a right.

In most countries, proceedings to limit the liability of the owner are never taken by a creditor of any kind, because they are proceedings for the benefit of the owner alone; and I imagine that here freighters will seldom avail themselves of the right to take such proceedings, which the fourth section of our act confers. But surely the granting of such a right to owners of property does not warrant the conclusion that there are no other descriptions of demand, against which the ship owner may be protected, when all kinds of demands are covered by the plain words used in that portion of the act framed expressly to declare the limit of his liability.

It seems, therefore, that the provisions of the fourth section should not be held to engraft any restriction upon the language of the third section, unless it be found that the third section is incapable of being carried into effect except by means of methods and proceedings provided in the fourth section. It cannot be so found, if it be held that the admiralty has jurisdiction to enforce the section, by reason of the subject-matter.

When this act was first presented to my consideration, upon the application made in regard to Place v. The City of Norwich [Case No. 11,202], although I denied the application up-

on a ground which appears to be sustained by the decision of the supreme court in Wright's Case [supra], namely, that a proceeding to obtain the benefit of the act must be a proceeding independent of an action in rem, I expressed the opinion that a court of admiralty could not entertain jurisdiction of a cause of limitation of liability, no matter how brought. But now, better instructed by the supreme court, and bound to hold that such a cause is within the jurisdiction of the admiralty by reason of the subject, I can add, without hesitation, that the owners of a ship can, without difficulty, obtain at the hands of that court all the relief intended by the act, and without any resort to or violation of any provision in the fourth section contained. For the admiralty creates its own forms of proceeding, and adapts methods of its own to the varied necessities which present themselves to its consideration. The power to do this is part, and the important part, of the jurisdiction of the admiralty. "The principles, rules and usages which belong to courts of admiralty" (Process Act 1792 [1 Stat. 275]) enable these courts to work justice between man and man with celerity and economy. They accomplish this by ways unknown to other courts, and for many of which it were vain to look in any statute. Stripped of the power to pursue these methods, there would be little left to distinguish a court of admiralty from a court of equity or of law. So the admiralty and maritime jurisdiction of the United States has been described as "embracing a system of procedure known and established for ages." The Magnolia, 20 How. [61 U. S.] 303. Therefore is it said that "a maritime lien arises from the jurisdiction, not the jurisdiction from the lien." Smith v. Brown, 1 Asp. 59.

For the sake of maintaining uniformity, the supreme court of the United States, which is the highest court of admiralty, has been given power to prescribe and regulate the forms and modes of proceeding to be followed by all the district courts in the exercise of their admiralty jurisdiction; but when cases arise which have not been provided for in the rules prescribed by the supreme court, the district courts, as the only courts of original jurisdiction in admiralty, have the power and are bound to devise modes of proceeding which shall enable them to carry into effectual execution any law which they are called to administer. "The reason of the thing and usage" afford a sure ground for procedure in courts of admiralty. The Orpheus, 3 Marit. Law Cas. 532. Thus guided, it has been possible for the maritime courts of the continent to administer a rule of limited liability similar to that stated in the third section of the act of 1851, without the aid of any special statutory modes of proceeding. No modes of proceeding appear to have been attached to the rule when placed in the Ordinance, and none appear in the Code de Commerce. In England, where the execution of the law was at first intrusted to the courts of equity, statutory modes of proceeding were provided for these courts, some of which appear in the fourth section of our act. But here, where the jurisdiction is given to the admiralty by reason of the subject-matter, the courts of admiralty are certainly as well able as any courts of admiralty to exercise it effectually; and other maritime courts, say the supreme court, "have found no difficulty in carrying the law into execution." In fact, one of the reasons given by the supreme court for holding the subject-matter in question to be within the jurisdiction of the admiralty courts, is because the modes of procedure belonging to those courts are so well adapted to carrying the law into execution. And the supreme court have, by the new rules, prescribed methods to be pursued by the district courts in carrying the law into effect, which are not to be found in section 4 of the act of 1851, thus not only showing the ability of these courts to contrive methods whereby to carry the law into execution, but also showing that, in the opinion of that court, no restriction of the act arises from the provisions of the fourth section, at least in respect to methods of procedure. For these reasons, therefore, I conclude that the legal effect of the act of 1851 is to limit the liability of the owner of a ship for injuries to persons as it does for injuries to property, and that notwithstanding the phraseology of the fourth section of the act, the statute so understood can be carried into execution by a court of admiralty, and that upon the facts set forth in this libel, it is the duty of the court to entertain the present proceeding and grant such relief therein as the proofs may show the libellant to be entitled to. In announcing this determination, I feel at liberty to say that I realize the importance of the main question here involved, and appreciate that the solution I have endeavored to give may have the appearance of extending the act of 1851 beyond any limit in the mind of the supreme court, when the decision of that court in the Case of Wright was made. But I give to the action of the supreme court in respect to this subject full scope and effect in this case with less solicitude, because, by entertaining the present libel, I furnish the parties in interest an opportunity, by means of an application for a writ of prohibition, to bring the subject before the supreme court with little delay or expense; and if I have made a mistake, I can thus at once be set right, and much litigation saved, not only to these parties, but to other parties similarly situated.

An order will, therefore, be made, directing that an appraisement be had of the value of the libellant's interest in the said steamer Epsilon and her freight, to the end that a monition be issued against all persons claiming damages by reason of the accident in the

said libel mentioned, citing them to appear and make due proof of their respective claims, and meanwhile that, until the further order of this court, the said Sarah Parsons be restrained from prosecuting her above mentioned suit against the libellant.