47 F.2d 206 (1931)
THE GLENDOLA.
STANDARD OIL COMPANY OF NEW JERSEY
v.
GLENDOLA S. S. CORPORATION.
No. 107.
Circuit Court of Appeals, Second Circuit.
January 5, 1931.
Shearman & Sterling, of New York City (Horace M. Gray and Sanford H. E. Freund, both of New York City, of counsel), for appellant.
W. H. McGrann and Kirlin, Campbell, Hickox, Keating & McGrann, all of New York City, for appellee.
Before MANTON, L. HAND, and SWAN, Circuit Judges.
L. HAND, Circuit Judge.
The libelant's steamer, Tilford, on the twenty-third day of April, 1925, was bound up the Cape Fear river for her pier in the city of Wilmington, North Carolina. When about two miles below the city she came into collision with the claimant's ship, Glendola, bound out, in which she was injured on her port bow, her plates being so bent that the seams opened, and her cargo of gasoline began to spurt from her side into the water. The circumstances were such as to persuade us that the Glendola was alone at fault, and we held her liable for the whole damages. 20 F.(2d) 1021. The question now arises as to the amount of the recovery.
After her injuries the Tilford kept on to her berth, leaking gasoline as she went, and a serious menace to herself, to nearby steamers, and to the wharves and the buildings upon them, after she reached her berth. Her ordinary way of berthing on the flood, which was then making, was to drop her anchor after a tug had come alongside her port bow. The combined power of the anchor and the tug, butting the stem, had theretofore proved enough to hold her bow against the tide, which meanwhile carried her stern upstream, and thus headed her across the river so that she could berth alongside the pier. Nobody questions the propriety of this navigation.
On the day in question it was not safe to order the tug, which was in attendance upon the steamer, upon her port bow, where the gasoline was leaking, for a spark on the surface *207 of the water might have started a disastrous fire. Instead, a line was heaved from the starboard bow of the steamer to the bow of the tug, on which she backed with all her power, thus relieving the strain on the port anchor, which had been let go at the proper time. The two did not, however, serve to hold her, and she drifted upstream, though canting somewhat to starboard, until she took the ground astern in shallow water, thus suffering additional damages. Being thus fast astern, her bow, floating upstream, collided with the end of the pier, still further damaging her, and doing some injury to the pier.
This succession of misfortunes so injured her that she had to be laid off and go to dry dock, before she could safely resume her duty, though she went under her own steam from Wilmington to Newport News for repairs. The libelant has recovered for all the damages suffered by the steamer, for the damage to the pier which she paid, for her detention or "demurrage" while in dry dock, and for sundry items which it is not necessary to set out in detail.
The first question is whether the Glendola is liable not only for the injuries caused by the collision down the river, but also for the strand and the collision with the wharf. Her faulty navigation having caused the first collision, she was a wrongdoer, and nothing is more unsatisfactory than the discussion in the books and by legal writers as to the limits of liability in such cases. It is commonly agreed that the duty of care towards others depends upon the likelihood that its omission may cause injury. The extent of the duty is not measured actuarially, that is, only in terms of its probability; it varies with the gravity of the injury which may result. One may be liable for mutilating or killing another, though the risk one takes is less probable of realization than greater risks, from the consequences of which one would be immune, if the results must be trivial. The law does not establish a zone of consequences, fixed merely by their probability, and impose liability upon any one whose acts bring to pass anything within it. Along with other considerations, it balances the interests at stake, and restricts the foresight required, as the damage to be apprehended diminishes. Thus the excuse for the act is itself a factor in determining the consequences with which the actor is chargeable.
However, there is much uncertainty in the books as to whether liability should be extended to remote consequences once the actor is shown to have been at fault. On the one hand are the greater number of decisions, of which In re Polemis, [1921] L. R. 3 K. B. 560, is an extreme instance, in which, because the omission was in any case likely to cause some damage, liability is extended to injuries for which the defendant would not have been responsible if they alone were to be apprehended. The wrong, once established, involves the wrongdoer in all its consequences. On the other hand are those decisions which treat remote consequences as though the wrong consisted in causing these alone, and which hold the actor only for such as he should have foretold. Chicago, B. & Q. R. Co. v. Gelvin, 238 F. 14, L. R. A. 1917C, 983 (C. C. A. 8); Beldon v. Hooper, 115 Kan. 678, 224 P. 34; Stone v. Boston & Albany R. Co., 171 Mass. 536, 51 N. E. 1, 41 L. R. A. 794; Wood v. Penn. Ry. Co., 177 Pa. 306, 35 A. 699, 35 L. R. A. 199, 55 Am. St. Rep. 728. See Atchison, T. & S. F. Ry. v. Calhoun, 213 U. S. 1, 7, 29 S. Ct. 321, 53 L. Ed. 671. The distinction is acutely presented when the actor has committed a wrong to one person, which in a train of unpredictable events involves another. In Palsgraf v. Long Island R. R. Co., 248 N. Y. 339, 162 N. E. 99, 59 A. L. R. 1253, the court held that the defendant was not liable to the second person. If not, it is hard to see why it should make a difference that a single person is twice injured, once in a way that entails liability, and second, in such a way, as standing alone would be too remote. If he is so liable, a difference in ownership of the two pieces of property, successively injured, might exonerate a wrongdoer as to that injured last, though he would be liable, had both been owned by a single person  scarcely a relevant distinction. The broader liability seems to rest upon punitive notions, extending responsibility because the actor is at fault, not in respect of what actually happens, but of something nearer. 8 Holdsworth, 463, 464. Perhaps this better satisfies the demands of history, but we must confess ourselves in doubt as to its consistency with usual notions.
In the case at bar, however, that question does not really arise, because it appears to us that, judged by either rule, the Glendola is liable for the strand and second collision. Even if we accept the narrower doctrine, and find it necessary that the later injuries must be reasonably apprehended at the outset, they were such. The Tilford was a tanker, and her cargo was visibly either oil or gasoline. To break her sides was to cripple her more seriously than other ships. If her cargo leaked, as well it might, she became a menace *208 to herself and all about her, and her navigation, disabled as she was, would be embarrassed whenever it required the approach of other steamers. She was bound to a pier and must soon dock; docking, especially in such a narrow berth, requires tugs and tugs carry fire. It did not require powers of divination to foresee that she would thus have trouble in docking, and while we agree that nobody could foretell exactly how this might arise, that was not necessary, if it was likely that it might include a strand in such narrow waters, under which she might swing with the tide against one shore or the other. These are what injured her, and these might fairly be predicted.
The claimant insists that the rig of the hawser to the tug's bow was improper, and that this was an "intervening wrong" which "broke the causal chain," relying upon our decisions in Cleary Bros. v. Port Reading R. R. Co., 29 F.(2d) 495, and Hansen v. E. I. Du Pont de Nemours & Co., 33 F.(2d) 94, 97. These do not hold that every intervening wrong excuses an earlier tort-feasor. We have indeed said at times that there cannot be "two proximate causes" for a wrong, e. g., The Panther, 5 F.(2d) 64, but in The George H. Jones, 27 F.(2d) 665, 668, we explained that this was not to be taken as meaning more than that there may be occasions when the intervention of another conscious agent may be so unexpected that the actor charged with the initial omission should be held no longer liable. This is the doctrine laid down in Cleary Bros. v. Port Reading R. R. Co. and in Hansen v. Du Pont. It is the probability of the occurrence of the wrong which counts, not the fact that it is a wrong; its unlawfulness is material only in so far as wrongs are less likely to happen than other events. Prima facie, it may be enough to excuse, but that is another question.
In the case at bar the rig of the hawser was warmly defended by the libelant. At most the tug lost no more than ten per cent. of her power, and her master believed that to lay it to her stern would have endangered her. While we are not clear why this was true, the decisions impose the burden upon the claimant to establish that the navigation of the injured ship was faulty, and the decision of those, put to it to avoid the consequences of the tort, is accepted unless plainly faulty. The City of Macon, 121 F. 686, 690 (C. C. A. 2); The Walter A. Luckenbach, 14 F.(2d) 100, 103 (C. C. A. 9); Allen & Robinson v. Inter-Island Nav. Co., 34 F. (2d) 83, 86 (C. C. A. 9); The Pensher, Swaby 211; The Gladiator, 79 F. 445, 447 (C. C. A. 1) semble; Marsden Collisions at Sea (8th Ed.) 117. The proof here is too uncertain to satisfy us that the rig was wrong, or that, if it was, it contributed to the strand. The same is true of the contention that the starboard anchor should have been let go. Thus we conclude that the Glendola was liable for the subsequent injuries.
There remains the calculation of the damages. We think that the "demurrage" was incorrectly computed, because the libelant failed to prove specific damages, attributable to the Tilford's detention in dry dock. It is an enormous corporation, regularly employing thirty-seven vessels of its own, and chartering others. They carry its own products, and its damage lay either in the embarrassment to its business in general, or in the cost of a substitute, chartered to take the Tilford's place. Under the doctrine of The Conqueror, 166 U. S. 110, 17 S. Ct. 510, 41 L. Ed. 937 [The North Star, 151 F. 168 (C. C. A. 2); The Winfield S. Cahill, 258 F. 318, (C. C. A. 2); Cuyamel Fruit Co. v. Nedland, 19 F.(2d) 489 (C. C. A. 5); Newtown Creek Co. v. City of N. Y., 23 F.(2d) 486 (C. C. A. 2); The Priscilla (D. C.) 27 F.(2d) 921]; the first is not provable when, as here, no definite sum can be attributed to the detention. It was certainly not enough to show the reasonable hire of such a ship as the Tilford, measured in terms of current fixtures. On the other hand we think that the hire of the Galena was allowable. This ship, which was smaller than the Tilford, the libelant chartered after the Tilford was again in commission, and for this reason the claimant argues that she could not be a substitute. There is, however, no inherent reason why this must be so. A company such as the libelant, with vast stores of oil and its products, may not find it necessary to make its shipments on the day, but their accumulation will in the end tell upon its crippled service, and leave a surplus for which other ships must be secured. The fact that another vessel may not be chartered until the injured ship is again on duty, does not necessarily make her any the less a substitute. The evidence is uncontradicted that the Galena was chartered as such, and the claimant should be charged with her hire, though this is the limit of its liability.
We cannot see how the damages to the dock at Wilmington, which the libelant was forced to pay, can be included in a suit in the admiralty. Assuming that the claimant was liable for these, the District Court would *209 have had no jurisdiction over the controversy, any more than over the claim against the Tilford, whose satisfaction is the basis of the disputed item. It was an injury done on land, and a court of admiralty has no power to adjudicate it. The Plymouth, 3 Wall. 20, 18 L. Ed. 125; Cleveland, T. & V. R. Co. v. Cleveland S. S. Co., 208 U. S. 318, 28 S. Ct. 414, 52 L. Ed. 508, 13 Ann. Cas. 1215; Martin v. West, 222 U. S. 197, 32 S. Ct. 42, 56 L. Ed. 159, 36 L. R. A. (N. S.) 592; The Haxby (C. C. A.) 94 F. 1016. The libelant seeks to include the item because it would have been recoverable in limitation proceedings (The Epsilon, 6 Ben. 378, Fed. Cas. No. 4506), but the distinction is patent, assuming arguendo that the decision relied on was correct. Congress, having given relief to shipowners which includes an injunction against suits terrene, as well as maritime, was possibly forced to make the resulting concourse an adequate relief for the remedy taken away, and, if so, this required the admissibility of all claims enjoined. A libel for the injuries must rest upon other grounds.
There are various other items of minor importance which we need not discuss at length. The "out of pocket" expenses should be confined to wages, provisions, fuel and stores. The Tremont, 161 F. 1 (C. C. A. 9). There is no evidence that more than one classification survey was necessary [New Haven, etc., Co. v. N. Y. (D. C.) 36 F. 716; The Benjamin A. Van Brunt (D. C.) 3 F.(2d) 655, 658]; item nine is, therefore, not allowable. Items ten, eleven and twelve should also be struck out. Item three is allowable.
We see no reason to reopen our original decision on the merits.
Decree reversed, and cause remanded for further proceedings in conformity with the foregoing, unless the parties can agree.