SINCLAIR REFINING CO. v. SUN OIL CO.

THE PATRICK J. HURLEY.

THE AMERICA SUN.

United States District Court
S. D. New York.
Sept. 30, 1948.

---

Burlingham, Veeder, Clark & Hupper, of New York City (Stanley R. Wright, of New York City, of counsel), for libellant.

Mendes & Mount, of New York City (Henry W. Dieck and Wilbur H. Hecht both of New York City, of counsel), for claimant.

MEDINA, District Judge.

The steamship "Patrick J. Hurley" was in collision with the motor-vessel "America Sun" on March 12, 1942. On April 14, 1942 the Sinclair Refining Company, owner of the "Patrick J. Hurley," libelled the "America Sun" in this Court, and its owner, the Sun Oil Company, appeared as claimant to defend. The parties settled the collision liability by a consent decree, each conceding fault and agreeing to bear half its own damages. A balance was therefore payable to Sinclair Refining Com-pany, the owner of the more seriously damaged ship. Most items of damage the parties agreed on; the disputed items, and the question whether interest should be allowed, were referred to a Special Commissioner, on August 23, 1945. Due to the illness and subsequent death of the Commissioner first appointed, it was necessary to designate a successor, whose report was filed on December 11, 1947, and I must pass on the exceptions filed by the parties. They fall into three groups. In the first two, Sun Oil Company objects to an allowance of damages for the detention of the "Patrick J. Hurley" following the collision, and objects to the inclusion of insurance premiums as an item of damages. In the third, Sinclair Refining Company objects to the disallowance of all interest on the award.

As a result of the collision, the "Patrick J. Hurley" was laid up for repairs for thirty-four days. The Commissioner decided that the Sinclair Refining Company had sustained a loss thereby, and measured it as follows. On the 18-day voyage preceding the collision, the "Patrick J. Hurley" had carried oil at a cost of 24½¢ a barrel, which was 30¾¢ lower than the government-established tanker rate for petroleum products shipped from the Gulf to North Atlantic ports. 30¾¢, multiplied by 119,-432.07 barrels, the number carried on that voyage, divided by 18, results in earnings of $2,040 a day. The Commissioner assumed the daily earnings during the detention would have been the same as those of the prior voyage. Thus, $2,040 multiplied by the 34 days of detention yielded $69,360 as detention damages.

The Sun Oil Company objects to the allowance of any detention damages, asserting there was no proof that the detention caused loss, and, if damages are allowable, objects to the Commissioner's method of computing them. I hold that this exception must be sustained. The Commissioner has in effect allowed as detention damages an amount which would have been the net cost to the Sinclair Refining Company of chartering a substitute for the "Patrick J. Hurley" during the period of its detention had such a substitute been

procured. I do not find in the record the evidence that is necessary to justify such an award.

The evidence shows that the Sinclair Refining Company was engaged in the purchase, refining, transportation, and sale of petroleum products. To bring crude oil to its refineries in 1942, it used every available means, including tank cars, pipelines, and its own tankers, twenty-one in number at the time of the collision. Transportation by tanker was cheaper than by tank car and pipeline. The transportation of Sinclair's own products kept these vessels busy, since there was an extraordinarily great demand for tankers and petroleum products. At the time of the collision, the "Patrick J. Hurley" was proceeding in ballast to a Gulf port, where it would have loaded oil. This oil was not set aside for it, but would merely have been drawn off from a large stock in storage. The "Patrick J. Hurley" would have carried the oil to the Sinclair refinery at Marcus Hook, Pennsylvania, which was operating under wartime pressure at what was termed full capacity, though it is likely that more crude oil could have been refined there had it been available. I do not know what happened to the oil which the "Patrick J. Hurley" would have carried had it not been detained. One witness testified that it was probably refined at Houston, Texas, and sold. No vessel was chartered to substitute for the "Patrick J. Hurley," for none was to be had.

█ Where a substitute is actually chartered to transport cargo that would otherwise have been shipped on the vessel detained, there is no doubt that the cost of the substitute is properly awarded as an element of damage. The Glendola, 2 Cir., 1931, 47 F.2d 206, certiorari denied, Standard Oil Co. v. Glendola S. S. Corp., 1931, 283 U.S. 857, 51 S.Ct. 650, 75 L.Ed. 1463.

Where no substitute is procured, however, and the owner of the detained vessel makes some other arrangement for the flow of the goods that would have been transported on the injured vessel, the problem is different. The applicable legal principles in such a case were thoroughly explored by the Supreme Court in Brooklyn Eastern District Terminal v. United States, 1932, 287 U.S. 170, 53 S.Ct. 103, 77 L.Ed. 240. In that case the petitioner was in the business of towing car floats for railroads by tug, and its business was sufficient to occupy three tugs. One of its tugs was disabled and, instead of hiring an extra tug as a substitute, petitioner used its two other tugs overtime. The District Court, confirming the Commissioner's report, allowed demurrage at the rate of $150 a day, the market hire of another tug, for each of the seventy-eight days that the tug was withdrawn for repairs. On appeal the Circuit Court of Appeals for the Second Circuit excluded that item, 1932, 54 F.2d 978, and this determination was affirmed by the Supreme Court.

█ While the Brooklyn Eastern District Terminal case involved a vessel for hire rather than one transporting the owner's own goods, the Supreme Court clearly saw no legal difference in these fact situations but rather cited cases involving both situations in evolving the principles therein set forth. Nor do I perceive any difference. The case is the same whether it be that of the owner of a detained vessel for hire who does not procure a substitute but tries to accommodate the available business by use of existing facilities, or that of the owner of a detained vessel used to transport his own goods who does not procure a substitute but tries to carry on his business by making other arrangements for the flow of his goods. In either case the owner is entitled to damages representing the proved expense or loss of profits in his business resulting from the detention of his vessel. Where the owner is in the business of chartering his vessels, the losses that are relevant are those incurred in that business. Where the owner is in the business of processing and selling goods, and transports them in his own vessel incidental to that function, then the losses that are relevant are those resulting from "the embarrassment to its business in general," as was held in The Glendola, 2 Cir., 1931, 47 F.2d 206, 208. In other words, the losses that are relevant here are the losses in the business of selling oil, not the losses in a shipping business.

1008

The rule laid down in the Brooklyn Eastern District Terminal case is that the cost of a supposititious substitute can be allowed as detention damages only where there is evidence that the gains lost have been substantial and only where there is evidence that awarding the cost of the substitute will represent fair indemnity for the losses sustained.

It is impossible to determine from this record what losses, if any, the Sinclair Oil Company sustained in its business by virtue of the detention of the "Patrick J. Hurley." Nor am I able, on this record, to determine what relation the recovery of $69,360 bears to such losses. Did the average amount of oil refined at Marcus Hook drop while the "Patrick J. Hurley" was detained? Did libellant breach any commitments because the oil did not arrive at Marcus Hook when it normally would have arrived? Did libellant have to ship the oil to Marcus Hook by the more expensive tank cars or pipelines? If so, what was the expense? If the oil was not shipped north but was refined at Houston, was it any less advantageous for libellant to refine oil at Houston than at Marcus Hook? Did libellant incur expenses for overtime payments by refining the oil at Houston? Did the fact that there was more oil available for refining at Houston compensate for the fact that there was less available at Marcus Hook? Was the market around Houston less favorable to libellant than that in the neighborhood of Marcus Hook? Did libellant lose any customers because it could not supply them with oil rapidly enough? Did the market for oil change to libellant's disadvantage by the time the oil was finally refined? No answer to any of these questions is to be found in the record.

A mere likelihood of some indeterminate expense or loss of profits is certainly not a sufficient ground upon which to allow the cost of a hypothetical substitute as damages for detention. In the Brooklyn Eastern District Terminal case the Supreme Court readily recognized the possibility of extra wages and increased wear and tear in the overtime use of the available tugs. But there being no proof concerning these or other items, the award of the cost of a substitute was disallowed.

While it is true that the findings of a Commissioner should not be disturbed unless clearly erroneous, Ozanic v. United States, 2 Cir., 1948, 165 F.2d 738, 742; La Bourgogne, 2 Cir., 1906, 144 F. 781, 783, especially where, as here, they bear internal evidence of most thorough and painstaking consideration, and while his judgment in the matter of the standard of recovery to be applied is entitled to weight, Brooklyn Eastern District Terminal v. United States, 1932, 287 U.S. 170, 176, 53 S.Ct. 103, 77 L.Ed. 240, nevertheless they cannot stand when based upon some misapplication of the legal principles which govern the case. To treat the Brooklyn Eastern District Terminal and The Glendola cases as exceptions to the general rules is merely to add confusion to an already complicated subject. Properly understood and related, these cases harmonize and clarify the various aspects of the body of applicable law. They reinforce the repeated holdings of our Circuit Court that detention damages are for indemnity only. Navigazione Libera Triestina Societa Anonima v. Newtown Creek Towing Co., 2 Cir., 1938, 98 F.2d 694, 699, and cases cited.

The libellant not having proved damages may not recover an award for the detention of the "Patrick J. Hurley." Navigazione Libera Triestina Societa Anonima v. Newtown Creek Towing Co., 2 Cir., 1938, 98 F.2d 694, 699; The Loch Trool, D.C.N.D.Cal.1907, 150 F. 429; The Saginaw, D.C.S.D.N.Y. 1899, 95 Fed. 703. Claimant's exceptions one to five are sustained.

This determination of the question of detention damages also disposes of the claim for insurance premiums as an item of damages. They should probably have been disallowed in any event. The Baltimore Maru, 5 Cir., 1926, 11 F.2d 836; The Tremont, 9 Cir., 1908, 161 F. 1; Satartia- F. J. Luckenbach, 1932 A.M.C. 1549 (S.D. N.Y. 1932). Claimant's exceptions six and seven are sustained. Exception eight was not pressed.

After a careful review of the entire record and having in mind the circumstances particularly adverted to by the Commissioner, I agree with his finding

"that justice will be done by the disallowance of interest." Libellant's exception is overruled.

Libellant's alternative claim for detention damages, based upon interest on the capital investment of the "Patrick J. Hurley" and depreciation, has not been passed on either factually or as matter of law. The case is accordingly referred back to the same Special Commissioner for consideration and report thereon.

Settle order on notice.